*E-FILED: July 22, 2013*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TRUSTEES OF THE BAY AREA ROOFERS HEALTH AND WELFARE TRUST FUND; ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>TRADESTAFF CONTRACTING SERVICES; ET AL.,<br><br>Defendants. | No. C11-05977 HRL<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MOTION FOR DEFAULT JUDGMENT**<br><br>**(Re: Dkts. 44, 54)** |

Plaintiffs, trustees of Taft-Hartley Trust Funds, sue five entities for nonpayment of employee benefits. Plaintiffs allege breach of collective bargaining agreements, breach of trust agreements, and violations of the Employee Retirement Security Act of 1974, as amended, 29 U.S.C. § 1002(1), (2) *et. seq.* ("ERISA"). Heritage Contracting Services ("Heritage"), a now-dissolved non-party to this suit, was a union entity and a signatory to collective bargaining agreements and trust agreements. Defendant JRM Contracting ("JRM"), which was owned and controlled by the same individual who owned and controlled Heritage, was a non-union entity. Plaintiffs allege that Heritage and JRM attempted to evade their obligation to contribute to employee benefit plans by

having JRM, the non-union entity, issue payments to employees. Plaintiffs allege liability against the remaining defendants on a theory of alter ego liability.[1]

Heritage filed for bankruptcy before Plaintiffs filed this action. Defendant JRM filed for bankruptcy about a year after this action was filed, and the case has been stayed against it. Plaintiffs settled with defendant J.M.O.G. Contracting Services dba Alliance Contract Services ("Alliance"), and the Court has conditionally dismissed Alliance.

That leaves Spectrum Specialties LLC ("Spectrum"), Tradestaff Contracting Services ("Tradestaff"), and J.R.M. Real Estate & Investments ("JRMREI"). The complaint against these three defendants is based on alter-ego liability, successor corporation liability, and piercing the corporate veil due to the intentional undercapitalization of the now-bankrupt Heritage and JRM. Counsel that had initially represented these defendants moved to withdraw as counsel, and the Court granted counsel's motion in January 2013. A couple weeks later, Tradestaff and JRMREI obtained new counsel, but Spectrum has not been represented by counsel since January 2013. In February 2013, the Court struck Spectrum's answer as a sanction for its failure to provide discovery.

Plaintiffs now move for default judgment against Spectrum, and for summary judgment against Tradestaff and JRMREI. Though Tradestaff and JRMREI are still represented by counsel, these entities did not oppose the motion for summary judgment or appear at the hearing on the motion, which was held on May 7, 2013. The hearing on plaintiffs' motion for default judgment against Spectrum was held on July 17, 2013. Upon consideration of the moving papers, as well as the arguments of counsel at the hearing, this Court grants plaintiffs' motion for summary judgment against Tradestaff and JRMEI and grants plaintiffs' motion for default judgment against Spectrum.

---

[1] Each party has expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); FED. R. CIV. P. 73.

2

**BACKGROUND**

The motion for summary judgment against Tradestaff and JRMREI, and the motion for default judgment against Spectrum, rely on the same evidence of damages and liability. As plaintiffs' motions are unopposed, the facts are undisputed. The following background is drawn from the competent evidence submitted in support of Plaintiffs' motion for summary judgment:

Plaintiffs are Taft-Hartley Trust Funds - the National Roofing Industry Pension Plan ("NRIPP"), as well as local funds the Pacific Coast Roofers Pension Fund, the Bay Area Roofers Health and Welfare Trust Fund, the Santa Clara County Roofers Vacation Trust Fund, the Santa Clara/San Benito Roofers Joint APPR and Training Fund, and the Santa Clara Valley & Vicinity Roofing Ind. Labor Management Fund (collectively "Bay Area Funds"). By signature and by virtue of its membership in the Associated Roofing Contractors of the Bay Area Counties, Inc., Heritage was bound to the Collective Bargaining Agreements for Roofers Locals 40, 81, and 95. James Morris, who owned and controlled Heritage, signed the Collective Bargaining Agreements for Local 40 and 81 on November 11, 1993. In addition, On August 1, 2006, Morris, on behalf of Heritage, became a regular member of the Associated Roofing Contractors of the Bay Area Counties, Inc.. Members of this association are bound to the Local Union contracts for Local 40, 81, and 95. (Stephenson Decl., Dkt. 44-10, 2:21-29, 3:1-5, Ex. 3; Callahan Decl., Dkt. 49, Ex. 30, p. 15).

The Collective Bargaining Agreements for Roofers Locals 40, 81, and 95 incorporate by reference the NRIPP and Bay Area Fund trust documents. (Stephenson Decl. 3:4-9; Bohrer Decl. 2:10-16). These trust documents allow plaintiffs to audit the books and records of signatory employers and entitle them to liquidated damages, interest, attorney's fees, and court costs in the event they have to sue to collect unpaid benefits. (Stephenson Decl. 3:6-21; Bohrer Decl., Dkt. 44-1, 2:10-16).

**A. NRIPP Audit**

Before Heritage filed for bankruptcy, NRIPP performed an audit on Heritage, the signatory contractor, and JRM, the non-signatory contractor, for the time period between January 1, 2006 and December 31, 2008. The audit revealed that the vast majority of the employees for JRM were also employees of Heritage, and covered under the Collective Bargaining Agreement signed by Heritage. These employees were paid benefits for hours reported by Heritage, but they were not paid benefits for hours reported by JRM. (Derrick Decl., Dkt. 44-7, 4:21-29, 5:18-24, Ex. 17).

The auditor concluded that the JRM payroll was being used to circumvent payment of union employee benefits that should have been reported and paid by Heritage. (Derrick Decl. Ex. 17, pp. 5, 12, 23, 41). The NRIPP audit then calculated amounts due from Heritage for hours that were paid by the related entity JRM, but should have been paid and reported by Heritage. (Derrick Decl. Ex. 17, pp. 5, 12, 23, 41). Of the total hours reported on the JRM audit, 43,859 hours were attributed to employees that were also on the Heritage payroll and the Union transmittal reports submitted by Heritage to the Bay Area Funds. (Derrick Decl. 5:12-18). A total of 11,418.8 hours were listed as amounts for employees that were not listed on any of the union report forms. (Derrick Decl. 5:12-18). Because of the almost completely identical workforce of Heritage and JRM, the NRIPP auditors attributed all of the JRM contracting hours to the union contractor, Heritage. (Derrick Decl. 4:21-29). The audit calculated a balance due of $86,564.40 to the NRIPP, which includes liquidated damages and interest at the rate set forth in the NRIPP trust documents. (Derrick Decl. Ex. 17, pp. 5, 6, 12, 13, 23, 24, 41, 42).

**B. Bay Area Funds Audits**

The Bay Area Funds performed two audits on Heritage. The first audit covered the time period from August 1, 2005 through May 31, 2010. It was based on Heritage payroll records only, because the auditors did not have access to JRM's records. The first audit, after a revision, showed amounts due for under-reported hours, drive-time hour discrepancies, cash disbursements paid to non-union subcontractors, and fringe benefits due to the Bay Area Funds. (Capers Decl., Dkt.44-4,

4

pp. 3-5). The first audit showed a total due of $179,420.96. This amount includes interest through March 22, 2013. (Capers Decl. 5:20-27, 7:18-21).

The second Bay Area Funds audit was for hours reported on the JRM payroll. This audit was based on the hours reported by the NRIPP auditors on the NRIPP audit. (Capers Decl., 6:1-21). The auditor multiplied the number of hours for each employee on the NRIPP audit, by the rate for the Bay Area Funds. (Capers Decl. 6:1-15). The final version of this audit showed a total of $963,521.32 due to the Bay Area Trust Funds on the hours reported by JRM, plus $130,060.00 in liquidated damages, for a total of $1,273,002.28 (Capers Decl. 7:7-16, 7:18-21). This amount includes interest through March 22, 2013. (*Id.*)

So, the total amount due to the Bay Area Trust Funds based on under-reported hours on the Heritage records and hours only reported on JRM records, comes to $1,273,002.28. (Capers Decl. 5:20-27, 7:7-16, 7:18-21). The total amount due to NRIPP comes to $86,564.40. (Derrick Decl., Ex. 17, pp. 5, 12, 41, 23).

### C. Alter-Ego Liability Facts

All of the defendants essentially operated as one company. There was one signatory union business entity and several similar or closely related non-union businesses with similar ownership. All of the entities conducted less-than-arms-length transactions with one another.

James Morris was the owner of Heritage (prior to it filing for bankruptcy), of JRM (before it filed for bankruptcy), of JRMREI, and of Tradestaff. (Morris Dep. 11:14-18, 20:2-4, 83:12-21; 64: 13-19; 64:21-25; 65:1-2). Spectrum was owned 1/3 by James Morris, 1/3 by Omar Garrido and 1/3 by Victor Garrido. (Garrido Decl., 4:23-27, 5:1-15).

Both Heritage and JRM operated at the same time, and they had the same workforce. (Derrick Decl., 4:21-29, Ex. 17, pp. 5, 12, 23, 41). Union employees of Heritage were receiving

5

paychecks from both Heritage and JRM at the same time, even though, to their knowledge, they only worked for Heritage. (E. Noya Decl., Dkt. 44-8, 2:21-28; Cortez Decl., Dkt. 44-6, 2:17-29; B. Noya Decl., Dkt. 44-2, 2:17-21). Employees would even receive paycheck from both entities for the same pay period. (E. Noya Decl. 3:5-10). One employee stated that he received paychecks from Heritage, JRM, and Tradestaff, even though he only worked for Heritage. (E. Noya Decl. 2:19-27, 3:15-16). Both the "Heritage Jobs" and "JRM Jobs" used the same equipment and the same employees. (E. Noya Decl. 2:29, B. Noya Decl. 2:25, Cortez Decl. 3:1). Audits and employee statements indicate that Heritage and JRM were splitting employees' hours between the two companies Heritage and JRM.

     **a. Tradestaff**

Morris, the owner of all of these entities, has admitted that JRM and Tradestaff were operated as the same company. (Morris Dep., Dkt. 44-12, 35:7-14). Tradestaff controlled the payroll and finances of both Heritage and JRM. The same bookkeeper, Arian Arechiga, administered the payroll for Heritage, JRM, and Tradestaff. (Morris Dep. 36:10-25, 37:1-8). Tradestaff controlled all of Heritage and JRM's income, and it performed the record-keeping for these entities. (Garrido Decl. 2:2-28; Morris Dep., 35:7-14; Arechiga Dep. 22:3-8, 39:25, 40:1-5).

Tradestaff was also Heritage and JRM's general contractor. (Garrido Decl. 2:25-27; Morris Dep. 13:10-23; Arechiga Dep. 20:24-25, 21:1). Heritage worked exclusively for Tradestaff – it did not work with any other general contractors. (Garrido Decl. 2:25-26). Tradestaff would put together bid packages, which would include the total amount of the bid that Heritage would be paid by Tradestaff for the job. (Garrido Decl., 2:26-28, 3:1-3). Heritage had no control over the bid price – its job was to bring in the bids at or under the bid price required by Tradestaff. (Garrido Decl. 3:4-16).

6

Tradestaff made loans to Heritage and JRM Contracting to cover payroll. Little or no interest was charged on these loans, and no loan documents were created. (Morris Dep. 46:18-25, 47:1-9; Morris Dep. Ex. 16).

In discovery, Tradestaff provided cover sheets for bids between JRM and Tradestaff, and Heritage and Tradestaff. Tradestaff was unable to provide any other documents or written agreements of any type regarding the business relationship between Tradestaff, Heritage, and JRM. (Morris Dep. 16:1-21, 17:1-25, 18:1-7).

Tradestaff, JRM, and Heritage had a unified phone system that had extensions for employees of all entities. (Arechiga Dep. 40:12-25, 41:1-19; Garrido Decl. 4:17-22). The phone numbers for Heritage, JRM, and Tradestaff all routed to the same main office. (Arechiga Dep. 40:12-25, 41:1-19). If someone were to dial Heritage, the number would roll over to Tradestaff. If someone dialed J.R.M. Contracting, the number would roll over to Tradestaff. (See Arechiga Dep. 40:12-25, 41:1-19).

Heritage and JRM had no assets. (Morris Dep. 65:3-25, 66:1-3,20-25, 67:1-6). When Heritage filed for bankruptcy, the petition filed by Morris on behalf of Heritage stated that it had $4,864.63 in assets to distribute. (Campbell Decl., Ex. 25 - Bankruptcy Filing of Heritage). When JRM filed for bankruptcy, the petition filed by Morris on behalf of JRM stated that it had $1,265.67 in assets to distribute. (Campbell Decl., Ex. 24- Bankruptcy Filing of J.R.M. Contracting). Morris stated that Heritage had no equipment, no property, and no accounts receivable. (Morris Dep. 65:1-25). Morris reviewed the bankruptcy filings of both Heritage and JRM and acknowledged that the assets listed in the bankruptcy were probably correct. (Morris Dep. 65:1-25, 67:1- 25).

      **b.  Spectrum**

Heritage and JRM used the same equipment. It was owned by Tradestaff, leased to Spectrum, and then subcontracted to Heritage and JRM by Spectrum. Spectrum was a trucking and equipment company that subcontracted almost exclusively to Heritage and JRM, and leased its equipment from Tradestaff. (Morris Dep. 63:1-25, 64:1-12; Garrido Decl. 4:26-27, 5:12-15). Tradestaff purchased equipment, which it leased to Spectrum. (Garrido Decl. 5:5-8). Spectrum paid the maintenance for the leased trucks, but owned no equipment on its own. (Garrido Decl. 5:5-8). Spectrum was paid on jobs based on bids created by Morris/Tradestaff (Garrido Decl. 5:8-15). Most of Spectrum's contracts were for Tradestaff subcontracts with Heritage and J.R.M. Contracting (Morris Dep. 63:2-25, 64:1-12; Garrido Decl. 4:26 27, 5:12-15; Morris Dep. Ex. 9, Ex. 10).

### c. JRMREI

According to Morris, its owner, JRMREI "owns one building" and "doesn't do any work." (Morris Dep. 5-9). JRMREI owned the office building located at 23453 Bernhardt Street, Hayward, CA ("the Building"). (Morris Dep. 20:5-11). JRMREI leased the Building to Tradestaff by verbal agreement, and then Tradestaff subleased the building, again by verbal agreement, to Heritage, and perhaps other entities. (Morris Dep. 72:14-25, 73:1-278:25, 79:1-25). Despite this arrangement, the general ledger of JRMREI showed direct payments from Heritage to JRMREI, and direct payments from JRM to JRMEI, that bypassed Tradestaff. (Morris Dep., Ex. 15 - General Ledger of J.R.M. Real Estate).

Heritage paid for tenant improvements and all utilities, costs, and upkeep at the Building. (Morris Dep. 22:18-25, 23:1-5). Morris stated that there was no set amount of rent, and that Heritage would just cover the amount on the Building's mortgage. (Morris Dep. 22:14-17). Heritage also paid for the repairs and upkeep of the Building. (Morris Dep. 22:18-25; 23:1-5).

8

## LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a), (c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *See Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See id*. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248-49.

After entry of default, courts may, in their discretion, enter default judgment. *See* FED. R. CIV. P. 55; *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In deciding whether to enter default judgment, a court may consider the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the

9

strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). In considering these factors, all factual allegations in the plaintiff's complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987). When the damages claimed are not readily ascertainable from the pleadings and the record, the court may conduct a hearing to conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. FED. R. CIV. P. 55(b)(2).

## DISCUSSION

Under a theory of alter ego liability, non-union entities can be bound to a collective bargaining agreement signed by an affiliated union entity if: (1) the non-union and union entities are a "single employer;" and (2) the non-union entity is being used in a sham effort to avoid collective bargaining obligations. *UA Local 343 United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Industry of U.S. and Canada, AFL-CIO et al. v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1470 (9th Cir. 1994). A court determines whether the non-union and union entities are a "single employer" by measuring the degree of common ownership, common management, interrelation of operations, and centralized control of labor relations. *Id.* at 1470-71.

Here, plaintiffs have established that Heritage, JRM, Tradestaff, JRMREI, and Spectrum were a "single employer." These entities had common ownership, management, operations, and labor relations. Tradestaff and Morris appear to have been controlling the operations of these entities, as well as managing their relationships and transactions with one another. Morris operated, managed, and owned, or partially owned, all of these entities. The entities had the same or substantially the same workforce, and used the same equipment for jobs. The employees were not aware of whether they were working for Heritage or for JRM, and Morris has even admitted that JRM and Tradestaff were operated as the same company. Further, Tradestaff would provide loans to Heritage and JRM with little or no interest, or documentation, to keep them afloat. Tradestaff,

JRM, and Heritage had a unified phone system with extensions for employees of all entities. Plaintiffs have established the interrelation of the operations by showing that all of the entities engaged in less-than-arms-length transactions with one another. Though Spectrum was apparently a trucking and equipment company, it owned no trucks or equipment. Instead, it leased trucks and equipment from Tradestaff, and subcontracted almost exclusively to Heritage and JRM, other Morris entities. Tradestaff and Morris controlled Spectrum's bids and contracts, just like they controlled Heritage and JRM's bids and contracts. Tradestaff also controlled JRMREI, a real estate investment entity. JRMREI owned one building, which it leased to Tradestaff. Though Tradestaff apparently subleased this building to Heritage, no written leases existed for either the lease to Tradestaff, or the sublease to Heritage. The amount of rent fluctuated, and, despite the arrangement of Tradestaff as lessee and sublessor, JRMREI's general ledger showed direct payments from Heritage, and even from JRM. Plaintiffs have demonstrated a substantial degree of common ownership, common management, interrelation of operations, and centralized control of labor relations.

As to the second factor, the auditors concluded that the JRM payroll was being used to circumvent collective bargaining obligations. The NRIPP audit reveals that thousands of hours of work performed by the union employees of Heritage were put on the payroll of JRM to fraudulently avoid paying proper wages and benefits. And, again, Tradestaff and Morris were using the Morris entities to effectuate the fraudulent scheme. Tradestaff controlled whether a particular contract was assigned to Heritage, the union entity, or JRM, the non-union entity. Plaintiffs have provided evidence that entitles them to prevail on an "alter ego" theory of liability against Tradestaff and JRMREI, and their evidence is uncontroverted. Summary judgment against Tradestaff and JRMREI is warranted.

As to the motion for default judgment against Spectrum, all of the *Eitel* factors favor entry of default judgment here. Plaintiffs' claims have merit and are sufficiently pled. Having reviewed the complaint, the court finds that Plaintiffs have adequately alleged, through a theory of alter ego liability, breach of collective bargaining agreements, breach of trust agreements, and violations of ERISA. The sum of money at stake in the action is significant. Nevertheless, because all liability-related allegations are deemed true, there is no possibility of a dispute as to material facts. Moreover, since January 2013, Spectrum has failed to appear or present a defense in this matter; and, there is no indication that its default was due to excusable neglect. While the court prefers to decide matters on the merits, Spectrum's failure to participate in this litigation makes that impossible. A default judgment against Spectrum is Plaintiffs' only recourse.

Plaintiffs seek $45,332.75 in attorney's fees and $4,467.34 in costs and have submitted a declaration and invoices in support of their request. The Court has reviewed the evidence and finds the fee and cost request to be reasonable.

**ORDER**

Based on the foregoing, the Court grants plaintiffs' motion for summary judgment against Tradestaff and JRMREI, grants plaintiffs' motion for default judgment against Spectrum, and orders the following:

1) Tradestaff, JRMREI, and Spectrum are jointly and severally liable to the Bay Area Funds in the amount of $1,273,002.28 plus prejudgment interest through the date of judgment;

2) Tradestaff, JRMREI, and Spectrum are jointly and severally liable to NRIPP in the amount of $86,564.40 plus prejudgment interest through the date of judgment;

3) Tradestaff, JRMREI, and Spectrum are jointly and severally liable to all plaintiffs for attorney's fees in the amount of $45,332.75, and costs in the amount of $4,467.34.

The clerk shall enter judgment and close the file.

SO ORDERED.

Dated: July 22, 2013

_____
HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

**C 11-05977 HRL Order will be electronically mailed to:**

Peter Kerle pkerle@omnillp.com

Roger Mark Mason rmason@smwb.com, chilton@smwb.com

Sue Campbell suecampbell@att.net, matthew@campbelltrustlaw.com, sue@campbelltrustlaw.com

Trevor Joseph Zink tzink@omnillp.com, bfraser@omnillp.com, pkerle@omnillp.com

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.**